## SHULTZ v. AMERICAN NAT. INS. CO.

### No. 3691.

Court of Civil Appeals of Texas. Beaumont.

June 20, 1940.

Rehearing Denied June 26, 1940.

James D. O'Connor, of Dallas, for appellant.

W. B. Handley, of Dallas, for appellee.

276

O'QUINN, Justice.

This was an action in County Court of Dallas County at Law No. 1, Dallas county, by appellant, Edna Shultz, surviving widow of Marvin H. Shultz, as beneficiary, against appellee, American National Insurance Company, on a policy of life insurance, No. 10138471, issued by appellee to the deceased, who died June 29, 1938. Appellant prayed for double indemnity, for attorney's fees in the sum of $150, and for costs, etc. Appellee's defense was that the policy lapsed for nonpayment of dues prior to the death of the insured. On trial to a jury, the following special issues were answered as indicated:

"Special issue No. 1:

"Do you find from a preponderance of the evidence, that at the time of the death of the insured, Shultz, the premium due May 23rd. 1938, had been paid to J. E. Chapman? Answer 'Yes' or 'No'. Answer 'Yes'.

"Special issue No. 2:

"Do you find from a preponderance of the evidence, that at the time of the death of the insured, Shultz, the premium due May 30th, 1938, had been paid to J. E. Chapman? Answer 'Yes' or 'No'. Answer 'Yes'.

"Special issue No. 3:

"Do you find from a preponderance of the evidence, that J. E. Chapman was authorized by defendant company to collect premiums on the insurance policy in question? Answer 'Yes' or 'No'. Answer 'Yes'.

"Special issue No. 4:

"What do you find from a preponderance of the evidence, would be a reasonable attorney's fee for the services of James D. O'Connor for prosecuting this cause? Answer in dollars, if any, and cents, if any. Answer $150.00."

Judgment was for appellee non obstante veredicto, from which appellant prosecuted her appeal to the Dallas Court of Civil Appeals. The case is on the docket of this court by order of transfer by the Supreme Court.

The sole issue presented by this appeal is whether, prior to the death of the deceased on June 29, 1938, the policy had lapsed for the nonpayment of premiums. On motion of appellee for judgment non obstante veredicto, the trial court found that issue, as a matter of law, in appellee's favor. Appellant's assignment of error is that "there was ample evidence before the jury to justify and sustain the answers of the jury to the special issues submitted by the court."

The policy of insurance contained the following provisions: "All premiums are payable in advance at the Home Office of the Company in Galveston, Texas, or to an authorized representative of the company on or before the date when due. Payments to be recognized by the Company must be entered when paid in the Premium Receipt Book belonging with this policy. If for any reason a company representative does not call for the premium when due, it shall be the duty of the insured to bring or send said premium to the Home Office, or to the Company's Representative, and if the insured shall fail to perform this duty within four weeks from the date on which said premium was due, this policy shall thereupon become void and all premiums paid hereon shall be forfeited to the Company, except as otherwise provided herein. Nothing herein is intended to, or shall be interpreted to authorize the acceptance of any premiums more than four weeks in arrears, any payment of which shall be at the sole risk of the person making payment, and shall not be credited upon the policy, whether entered in the Premium Receipt Book or not and shall be returned to the remitter upon demand."

The Premium Receipt Book has at the top of each page for entries a column indicating the amount of the premium, three columns to indicate the date when the premium was due, three columns to note the date when paid, and at the end a place for the signature of the collector, and reciting that on the first line of each page he should sign his full name, and afterwards his initials. At the top of each of these pages is: "Don't pay premiums to strangers."

The premium receipt book called for by the policy was introduced in evidence, and the premiums receipted for therein kept the policy in force to and inclusive of May 23, 1938. The insured, by the stipulations in the policy, was entitled to a "grace period" as follows:

"Grace Period—Premiums shall be paid in the order in which they become due and a grace period of four weeks shall be granted for the payment of every premium after the first............shall create an obligation on the part of the company to

receive premiums which are in arrears over four weeks.".

Dating the last premium payment on May 23, 1938, the insured died after the expiration of the full grace period—on June 29, 1938. It is on this showing that appellee bases its contention that the policy had lapsed for nonpayment of premium prior to the death of the insured.

Appellant relies upon the following statement of the evidence to raise in her favor the issues submitted to the jury, and on this evidence contends that the policy was "in benefit" at the time of the insured's death.

On the 21st day of May, 1938, J. E. Chapman issued and delivered to Marvin H. Shultz, the insured, the following receipt, in the form shown by a photostatic copy of the receipt brought forward in the statement of facts:

"Q. You had that book that covered this policy on your husband's life that is involved in this law suit? A. Yes, sir.

"Q. Where is that book now? A. I think it's at Mr. O'Connor's office.

"Q. Did you have that book? A. That's it there (indicating), I guess.

"Q. Did you have that book at the time of your husband's death? A. Yes, sir.

"Q. Did you get that book at the time that policy was issued to you? A. Yes, sir.

"Q. And you had it all during that intervening period of the time? A. Yes, sir.

"Q. On your husband's death, did you turn that book, with the policy, over to the American National Company? A. Yes, sir.

"Q. You got that policy and that book back, didn't you? A. Yes, I didn't get any of the receipts back.

"This is a Receipt for a Deposit on a Weekly Premium REVIVAL Application, and does not refer to, nor will amount be credited to any Policy in force at date of this receipt, nor to the Premium of an ORDINARY Policy (an Ordinary Policy is one upon which premiums are paid Monthly, Quarterly, Semi-Annually or Annually).

"American National Insurance Company
Of Galveston, Texas.
No. ................. .............5–21....1938.
Received of Marvin Shultz ...................$1.60.. being the arrears on Policy No........................ which the applicant requests the Company to revive subject to the following conditions:
The Company assumes no liability whatever under this policy unless on the date of revival, as shown by endorsement at the Home Office, the Insured is alive and in sound health and insurable according to the Company's standard of insurability as provided at original date of issue. If this application for revival is rejected or the Insured is not alive and in sound health the premiums referred to herein will be refunded.
(Signed) J. E. Chapman Agent."

Appellant gave the following testimony in explanation of the receipt book:

"Mrs. Shultz, how long, at the time of your husband's death, had you been carrying any policy of insurance with American National? A. I don't remember how long it was.

"Q. You had carried one of our policies for several years, had you not? A. Yes, sir.

"Q. With each one of these policies you had a little premium receipt book? A. Yes, lot's of times.

"Q. I just asked you about the premium receipt book; you had that book, didn't you? A. Yes, sir.

"Q. I am asking you about the book? A. Yes.

"Q. You got the policy back and the book back? A. No, sir; not at the time that I asked for it; I had to come back the second time to get it.

"Q. The first time that you asked for it the local office told you that it went to Galveston, didn't they? A. No sir, they didn't.

"Q. Anyway, you got them back? A. Yes.

"Q. Will you get that premium receipt book; I want to ask you some questions about it. (Witness secures same from her counsel) That book covers policy bearing

278

what number—the policy on your husband's life? A. (Witness looks) 10138471.

"Q. 10138471? A. Yes.

"Q. What is the weekly premium as shown by that receipt book there? A. 25-cents.

"Q. And who kept that book—you or your husband? A. We just had it there at the house.

"Q. Kept there at the house? A. Yes.

"Q. And does that book cover any other policies? A. Now, does it cover any other policies.

"Q. Yes? A. No, sir.

"Q. That is your husband's policy, the one that is involved here in this suit? A. Yes."

In explanation of the receipt as shown above, appellant testified as follows:

"Q. This little receipt that you have offered in evidence here; was that delivered to you? A. Yes. My husband gave it to me after man gave it to him down at cafe.

"Q. You got that from your husband? A. Yes.

"Q. You didn't see the man give it to your husband? A. No, sir.

"Q. And you don't know of your own knowledge what transpired between your husband and this man Chapman at the time that he gave this receipt to your husband, do you? A. No, sir, I don't.

"Q. You weren't there? A. No, sir; but I know—

"Q. I am just asking you, were you there? A. No, I wasn't with them.

"Q. Where did you get this other receipt, this little white receipt that you are talking about? A. My husband brought it to the house.

"Q. At the same time he brought the other? A. No, sir.

"Q. Before or after? A. After.

"Q. He brought the one in evidence here —? A. After—

"Q. Afterwards? A. Yes, sir. * * *

"Mr. O'Connor: I am going to introduce this and I would like to read this deposition to her.

"The Court: Let's go ahead and finish with this witness.

"Q. I would like to know whether that receipt was—

"Q. What is this, Mrs. Shultz? A. That is one of them but that is not the last one, the one that he picked up with the book that he didn't give back to me.

"Q. What is that—you say that is one of them? A. That is a receipt. That is one where he paid for 4 weeks for me and for him both, on both of the policies.

"Q. You have seen these before? A. Yes.

"Q. You have seen many of them? A. Yes.

"Q. Those are issued by the defendant Company? A. Yes.

"Mr. O'Connor: I want to introduce it in evidence.

"Mr. Handley: Let me look at it. * * *

"Q. Now, Mrs. Shultz, have you seen those kind of receipts? A. Yes.

"Q. How many times have you seen those kind of receipts? A. Several times."

In explanation of crossed lines marking out certain language in the receipt, appellant testified, "He always marked them out when it was a receipt."

Appellant and the mother of deceased also carried policies of life insurance on their lives with appellee.

■ The form of the receipt issued by appellant's agent on May 21, 1938, is not conclusive against her. True, it contains printed recitations that the receipt was for a deposit on a weekly premium revival application, etc., but it is significant that no policy number is named in the receipt, though the form has a blank place for the policy number. The inference arises on the face of the receipt that if the deposit had been on a "revival application" the policy number would have been given therein. It is also a weighty inference, if not conclusive, that the receipt was not intended as a "revival application" because Mr. Chapman, as appellee's agent, marked out the specific language that "the applicant requests the company to revive subject to the following conditions," and the conditions are also marked out.

Appellant's testimony raised the issue that the insured paid premiums to Mr. Chapman not recorded in the receipt book; that Mr. Chapman issued receipts for these premiums, on the form copied above, and that in issuing these receipts "he always marked them out when it was a receipt."

In evaluating appellant's testimony, appellee advances the following proposition: "We do not deny that a receipt is not con-

tractual, and that it may be explained by parol evidence, or even contradicted."

And against her testimony, appellee makes the following argument: "It is at this very point that the case of the plaintiff fails. She did not know anything about the transaction at the time the money was paid to Chapman by her husband, because that transaction took place away from her home, and she was unable to testify concerning it. There were two other policies upon which conceivably her husband might have paid arrears in premiums the policy on Appellant's life, or the policy on his life in favor of his mother. No attempt was made to show that these policies were not in a state of lapse at the time of this payment."

■■ Appellee's argument is not a sound construction of appellant's testimony. It must be conceded that appellee's agent received from the insured $1.60. Holding this money, appellee rested under the burden of showing that the insured did not pay it to Mr. Chapman as premiums on his policy. There was nothing to suggest that the insured was under any duty to pay the premiums on the policies issued on the life of his mother, or that he personally paid the premiums on the life of his wife. The evidence was that he regularly paid the premiums on his own life, and that the $1.60 was paid only two days before the maturity date of his own premium.

■ We concede appellant's proposition, advanced on authority of National Aid Life Ass'n v. Driskill, Tex.Civ.App., 138 S.W. 2d 238, that payment of premiums in accordance with the provisions of an insurance policy is a condition precedent to the establishment of liability against the company. It is our conclusion that the evidence raised the issue for the jury that the $1.60 was paid by the insured as a premium on his own policy.

■ We quote appellee's "Point No. 2": "A provision in an industrial insurance policy providing that the weekly premiums shall be entered by the agent signing a book kept by the policyholder in order to be recognized by the company, is a valid limitation of the agent's authority, and a policyholder having such a policy with that limitation is charged with knowledge of the agent's limited authority, and any payments he makes to an agent which are not entered on the book are made at his own risk, and in order to charge the company by reason thereof, he must go fur-

ther than merely showing payment to the agent—he must show a receipt of the money by the company."

This proposition is not a correct statement of the law. Parties cannot by contract alter the rules of evidence so as to preclude the court from receiving in evidence the true facts, admissible under the general rules of evidence. 20 Am.Jur. 45— Evidence, Sec. 15; Annotations in 68 A. L.R. 331; Texas Authorities: Southern P. Co. v. Phillipson, Tex.Civ.App., 39 S.W. 958; Ryan & Co. v. Missouri, K. & T. Ry. Co., 65 Tex. 13, 57 Am.Rep. 589; Missouri P. Ry. Co. v. China Mfg. Co., 79 Tex. 26, 14 S.W. 785; Galveston, H. & S. A. Ry. Co. v. Horne, 69 Tex. 643, 9 S.W. 440. The Texas authorities hold that contract abrogating fundamental rules of evidence is unreasonable, if not void, and will not be enforced. It is conceded that parties to a contract may provide that certain facts shall constitute prima facie evidence; this proposition is illustrated by recitations of facts in deeds of trust, etc. See Supreme Forest Woodmen Circle v. Garcia, Tex.Civ.App., 103 S.W.2d 1108; Kelley v. Goode, Tex.Civ.App., 1 S.W.2d 683.

■■ The stipulations in the policy in regard to the receipt book made it only prima facie evidence of the conditions of the premium payments; by introducing the receipt book, appellee made out a prima facie case that the policy had lapsed for nonpayment of premiums prior to the death of the insured. But its prima facie case was subject to rebuttal by proof that additional payments not recorded in the receipt book had been made to appellee. And the fact that these additional payments were not recorded in the receipt book did not place upon appellant the burden of tracing the payments into appellee's treasury. It was sufficient for her to show that the payment was made to appellee's authorized agent. Art. 4732, Sec. 1, Vernon's Ann. Civ.St., does not deny our construction of the evidence. This section of Art. 4732 simply provides: "That all premiums shall be payable in advance either at the home office of the company or to an agent of the company upon delivery of a receipt signed by one or more of the officers who are designated in the policy."

The testimony offered by appellant brought the receipt issued by Mr. Chapman for the insurance on the 21st day of May, 1938, within the provisions of Art. 4732.

The point should be stressed that appellant traced to appellee's agent $1.60, and that appellee made no effort to show the disposition made by it of this money. The presumption is that Mr. Chapman, as agent of appellee, was an honest man, and having authority to collect the $1.60, that he remitted it to appellee. If the money was not paid by Mr. Chapman to appellee, and that fact was a defense, it should have sustained its defense by proof; appellee was in position to show that it never received the money from its agent. If this money was credited by appellee to the policies on the life of appellant, or on the life of the mother of the deceased, appellee should have shown that fact; appellee alone was in position to show that fact.

It is our conclusion that the evidence raised and supports the jury's answers to the special issues, and that appellant was entitled to judgment on the answers of the jury. Therefore, her prayer should be granted "that this court enter its judgment reversing and rendering this case for appellant for the sum of Five Hundred ($530.-00) and Thirty Dollars together with interest from the 9th day of October, A. D. 1939."

Accordingly, the judgment of the lower court is reversed and judgment here rendered in favor of appellant against appellee for $530, being the principal of the policy in the sum of $380, plus the $150 attorney's fee, with interest at six per cent per annum from the 9th day of October, 1939, and for all costs of suit.

Reversed and rendered.